**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALBERTO OCHOA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. |
| **JOSE LOPEZ, EUGENE SCHLEDER,** | ) | |
| **ADRIAN GARCIA, and the CITY OF** | ) | |
| **CHICAGO,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, ALBERTO OCHOA, by his undersigned attorneys, for his complaint against

Chicago Police Officers, JOSE LOPEZ, EUGENE SCHLEDER, AND ADRIAN GARCIA, and

the CITY OF CHICAGO.

## INTRODUCTION

1.      Plaintiff, Alberto Ochoa, spent 17 years incarcerated in the Cook County jail and

Illinois Department of Corrections for the murder of Marilu Sochu - a crime he did not commit.

2.      In and around December 17, 2002, the Police Officer Defendants conspired

among themselves and with others, known and unknown, to prosecute Plaintiff for Sochu's

murder while indifferent to the fact that he was innocent.

3.      All of the Defendants concealed the fact that they had conspired to and did frame

Plaintiff for the murders by attributing a fabricated confession to the Plaintiff that was written in

English – a language Plaintiff could not speak or read.

4.      There were no eyewitnesses, no plausible motive, and no physical evidence connecting Plaintiff to the crime. Without the Defendants' concealment of evidence, falsification of evidence, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

5.      For nearly two decades, Plaintiff fought to prove his innocence while defendant LOPEZ continued to brutalize the communities he policed, routinely using physical violence against suspects and witnesses and framing people for crimes they did not commit. The CITY OF CHICAGO turned a blind eye to LOPEZ's obvious pattern of investigative misconduct and even rewarded his bad behavior with promotions and supervisory positions.

6.      After the Illinois Appellate Court reversed Plaintiffs conviction *a second time,* a Circuit Court of Cook County judge finally suppressed Plaintiff's confession, finding that the State did not prove that it was voluntarily given.

7.      On October 23, 2019, the Cook County State's attorney dismissed all charges against Plaintiff. That same day, Plaintiff was released from custody after having spent 17 years of his life incarcerated for a crime he did not commit.

8.      Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 ,1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

11.    Plaintiff Alberto Ochoa, resides in the City of Chicago. Plaintiff is also referred to as Alberto Daniel Ochoa or Daniel Ochoa.

12.    At all relevant times hereto, Defendants Jose LOPEZ (Star No. 20890), Defendant Eugene SCHELDER (Star No. 20371), and Defendant Adrian GARCIA (Star No. 20517), were members of the Chicago Police Department. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, coerce fabricated statements, and maliciously prosecute Plaintiff for Sochu's murder.

13.    Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

14.    Each of the individual Chicago Police officer defendants are sued in their individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

15.    In December 2002, Plaintiff, a 20-year old Mexican national lived at 2442 South St. Louis in Chicago Illinois with four other men. Plaintiff had moved to the United States from Mexico earlier that year and arrived in Chicago roughly six months earlier to find work as a day laborer. Plaintiff was not a member of any street gang.

16.     Plaintiff communicated exclusively in the Spanish language and had virtually no understanding of the English language. He could not read or write in English.

17.     On December 17, 2002, Plaintiff and his roommate Carlos worked until the late afternoon and picked up their paychecks. The two men then went to the liquor store to buy beer and rented movies to watch at home.

18.     Sometime after Plaintiff arrived home, Eduardo Torres ("Torres"), stopped by to collect some money Plaintiff owed him. Torres sometimes stayed at the apartment on St. Louis when he had fights with his girlfriend. Torres was 21 years old and was a member of the Latin Kings street gang. Torres was with two other Latin King members, Arturo Simon ("Simon"), 19 years old, and Arturo Bentazos ("Bentazos"), 16 years old. Plaintiff had previously met Simon but did not know Bentazos.

19.     Plaintiff repaid Torres the money he owed him and Torres left with Simon and Bentazos.

20.     Plaintiff watched movies with Carlos, drank some beer, and fell asleep on the living room couch where he typically slept.

**Gang-Related Shooting of Marilu Sochu**

21.     At around 7:30 p.m., Joe Maldonado, a 17-year-old member of the Two-Six street gang walked with his 15-year old girlfriend, Marilu Sochu, toward a friend's house in the 3000 block of South Kolin Avenue. As they were standing outside the house talking, a car drove by firing shots in their direction. Sochu was shot and killed.

22.      The car was green in color and had a plastic bag covering the driver's side window. Maldonado did not get a look at the occupants of the car but estimated that there were three or four individuals in the car who appeared to be Latino men with short hair. Maldonado

heard the occupants of the car yell, "King Love," signifying their affiliation with the Latin King street gang. The Latin Kings were a rival gang to the Two-Six street gang.

23.     Andrew Linares and Juan Morales, also Two-Six street gang members, heard the gunshots and saw the green car with the plastic covering the driver's side window speeding by. Linares and Morales could not describe any of the occupants of the car but estimated that there were four or five individuals in the car. A description of the car involved in the drive-by shooting was immediately broadcast via a flash message to all Chicago police personnel.

24.     At roughly 9:30 p.m., Chicago police personnel were notified of an armed robbery at 2410 S. Spaulding. After responding to that location, officers observed the distinctive green car associated with the earlier drive-by shooting double-parked near the Spaulding address. Chicago police officers arrested three individuals at that location, Arturo Bentazos who was seated in the driver's seat of the green car, and Arturo Simon and Ricardo Argueta, who were inside the building.

25.     The police recovered a knife from the car from which they lifted a fingerprint belonging to Simon. A cartridge casing was recovered from the console of the car that was determined to have been fired from the same firearm as cartridge casings recovered from the scene of the shooting.

26.     Both Simon and Bentazos' clothing tested positive for gunshot residue.

**Police Interrogations of Simon, Bentazos, and Torres**

27.     Simon and Bentazos were brought to Area Four Violent Crimes prior to 10:00 p.m. on December 17, 2002. Both teenagers were predominantly Spanish-speakers. Once at Area Four, Defendant GARCIA repeatedly interrogated Simon and Bentazos about their involvement in the shooting on Kolin Avenue.

28.     GARCIA interviewed the men in Spanish. At no point did GARCIA obtain a certified interpreter or arrange for another police officer to serve as an interpreter during his interrogations of Simon and Bentazos. Bentazos, a Mexican national who was only 16 years old and had an IQ of less than 70, was interrogated outside the presence of an interested adult or youth officer.

29.     GARCIA did not provide Simon or Bentazos with *Miranda* warnings prior to interrogating them.

30.     Both Bentazos and Simon denied involvement in and knowledge about the shooting.

31.     During questioning of Bentazos and Simon, GARCIA learned that Bentazos and Simon had been hanging out together for the better of the day on December 17, 2002. At a certain point during the day, they were joined by a friend, Eduardo Torres, who went by the nickname "Spook." All three men were members of the Latin Kings street gang.

32.     The trio (Bentazos, Simon, and Torres) went to a restaurant and video arcade called the Black Hole. After running out of the money, the group left the restaurant. Sometime thereafter, Torres decided to go to Plaintiff's apartment to collect some money owed to him.

33.     In the early morning hours of December 18, 2002, Maldonado, Linares, and Morales (the witnesses) viewed a line-up containing Bentazos and Simon but could not make any identification of the men.

34.     With no identifications of Simon and Bentazos, GARCIA knew that he had to obtain confessions from the young men in order to charge them. GARCIA continued to interrogate Simon and Bentazos, falsely telling them that he knew they were in the car and that

witnesses had identified them. Simon and Bentazos continued to deny involvement. Their requests for a lawyer were ignored.

35.     GARCIA eventually told Simon that if he did not name the shooter, GARCIA would pin the shooting on him [Simon]. GARCIA falsely told Simon that Sochu was alive and that if he just named someone as the shooter, he could go home. GARCIA knew that he had no intention of releasing Simon, but misled Simon into believing that he would not be in trouble if he named someone as the shooter.

36.     After roughly 15 hours of interrogation, Simon eventually agreed to provide a statement to GARCIA. His statement recounted some true facts about the day and events leading up to the shooting but Simon continued to deny being the individual who shot the weapon. GARCIA again told Simon that if he did not name someone as the shooter, Simon would be the shooter, particularly since Simon had gunshot residue on his clothing. GARCIA assured Simon that because Sochu was still alive, Simon would be able to go home once he identified the shooter. Simon capitulated and falsely claimed that Plaintiff was responsible for the shooting and had disposed of the gun.

37.     GARCIA knew or should have known that Simon's identification of Plaintiff as the shooter was untrue where Plaintiff had never been arrested and had no known contacts to any street gang while both Simon and Bentazos were covered in gunshot reside and active members of the Latin Kings street gang, GARCIA encouraged Simon's false account of the shooting knowing that by falsely promising Simon immediate release if he identified the shooter, he could secure a statement that would allow Simon to be charged under a theory of accountability.

38.     Armed with this false narrative, GARCIA told Bentazos that he knew the "truth" that Plaintiff was the shooter. GARCIA falsely told Bentazos that Sochu was still alive and that

if Bentazos told him that Plaintiff was shooter, he could go home. GARCIA falsely told

Bentazos that once he signed some paperwork, he would be released.

39.     Sometime before 2:00 p.m., GARCIA called felony review and Cook County

Assistant State's Attorney Jennifer Walker arrived at Area Four. GARCIA communicated

Simon's false account of the shooting to ASA Walker, and she summarized the account (from

GARCIA) in written form. Because ASA Walker did not speak Spanish, she had no ability to

speak with Simon directly and relied on GARCIA to serve as a translator.

40.     At 2:25 p.m. on December 18, 2002, Simon signed a handwritten statement

falsely implicating Plaintiff in the shooting in the presence of GARCIA and ASA Walker. The

statement was written in the English language despite the fact that Simon spoke minimal English

and could not read or write English at even a basic level of proficiency. GARCIA did not

translate the statement to Simon and falsely told him that if he signed the papers he could go

home. Simon was charged with murder after signing the handwritten statement.

41.      GARCIA falsely told ASA Walker that Bentazos gave a similar account of the

shooting and identified Plaintiff as the shooter. That statement was false as Bentazos never told

GARCIA that Plaintiff was the shooter. GARCIA did not tell ASA Walker that he had told both

Bentazos and Garcia that they could go home if they signed "paperwork."

42.     However, when ASA Walker learned that Bentazos was only 16 years old, she

insisted that the detectives locate Bentazos' parents so one of them could be present when he

signed the statement. Like Simon, Bentazos spoke limited English and ASA Walker had no

ability to speak directly to Bentazos without the benefit of a translator.

43. Having been on duty for nearly 24 hours, GARCIA handed the investigation over to Defendant LOPEZ, also a Spanish-speaking detective. LOPEZ had a long complaint-history of misconduct that included coercing witnesses and defendants into making inculpatory statements.

44. GARCIA told LOPEZ that Simon and Bentazos were both Spanish-speakers. GARCIA told LOPEZ, in sum and substance, that he had misled Simon and Bentazos into believing that Sochu was still alive and had gotten them to identify Plaintiff as the shooter. GARCIA admitted that he did not believe that Plaintiff was the shooter but admitted that he falsely told Simon and Bentazos that if they signed statements falsely implicating Plaintiff, they would go home.

45. At 7:30 p.m., Bentazos signed a handwritten statement prepared by ASA Walker in the English language. He signed the statement in the presence of ASA Walker, detective LOPEZ, and his grandmother Fidelia Sanchez who spoke no English whatsoever.

46. LOPEZ did not translate the statement to Bentazos or his grandmother, but instead, told them that Bentazos would be able to go home after the "paperwork" was signed. LOPEZ falsely told Bentazos and Sanchez that the victim was alive and that Bentazos would not be charged since he did not pull the trigger. Bentazos had an IQ that did not surpass 70 and both he and his grandmother had limited educations; neither of them had attended high school. After signing the statement, Bentazos was charged with murder.

47. LOPEZ and his partner defendant Eugene SCHLEDER then arranged to have Eduardo Torres arrested. Torres was arrested and brought to Area Four on the evening of December 18, 2002. Torres was also a Mexican national who had dropped out of high school during his freshman year and spoke and read minimal English.

48.     LOPEZ and SCHLEDER interrogated Torres at Area Four. Neither LOPEZ nor SCHLEDER mirandized Torres. Torres told the defendants that he wanted to call his family so they could get him a lawyer. LOPEZ denied the request.

49.     LOPEZ told Torres that he already knew what happened, that Torres was in the car but Plaintiff had committed the shooting. LOPEZ promised that if Torres told him what happened he could go home. Torres admitted that he was in the car with Simon and Bentazos but insisted that Plaintiff had no role whatsoever in the shooting. Torres told LOPEZ that Plaintiff was not a gang-banger and was not a member of the Latin Kings.

50.     Defendants LOPEZ and SCHLEDER told Torres that they wanted him to bring them to Plaintiff's home. LOPEZ and SCHLEDER along with other police personnel drove to Plaintiff's apartment with Torres in tow. They arrived at Plaintiff's apartment at 2442 S. St. Louis at approximately 3:00 a.m.

**Plaintiff's Arrest and Interrogation**

51.     Plaintiff was sleeping on the living room couch when he noticed lights and saw a group of people outside with flashlights. LOPEZ and SCHLEDER came to the front door and asked Plaintiff to identify himself. Plaintiff complied and was immediately handcuffed.

52.     LOPEZ spoke to Plaintiff exclusively in Spanish. Plaintiff heard other officers in the apartment speaking in English but he could not understand what they were saying.

53.     SCHLEDER brought Plaintiff through the kitchen and onto the back porch off the kitchen.  SCHLEDER spoke to Plaintiff in English but Plaintiff could not understand what he was saying. LOPEZ then began questioning Plaintiff in Spanish. LOPEZ accused Plaintiff of being involved in the murder of Sochu and demanded that Plaintiff tell him where the gun was secreted. Plaintiff denied having any knowledge about a shooting or a gun.

54.     After Plaintiff repeatedly denied any involvement and/or knowledge about the shooting, LOPEZ began to physically beat Plaintiff. While Plaintiff was handcuffed, LOPEZ repeatedly struck Plaintiff in the stomach. Plaintiff continued to deny having knowledge about the shooting or the location of any weapon. LOPEZ continued to beat Plaintiff, at one point choking Plaintiff while pushing his thumb forcefully into Plaintiff's sternum notch. LOPEZ threated to kill Plaintiff and hurled threatening and offensive language at Plaintiff.

55.     SCHLEDER was present when LOPEZ was questioning and physically beating Plaintiff on the porch. SCHLEDER took no actions to stop LOPEZ. LOPEZ eventually went inside and SCHLEDER remained on the porch with Plaintiff. SCHLEDER used his metal flashlight to strike Plaintiff in the groin.

56.     LOPEZ returned to the porch and grabbed Plaintiff and pulled him back into the house and into the dining room area, throwing him on the floor. The police ransacked the house but did not recover a weapon or any evidence of a crime.

57.     Plaintiff was then transported to Area Four where he was placed in an interview and handcuffed to the wall. Without mirandizing Plaintiff, LOPEZ began questioning Plaintiff about his involvement in Sochu's murder. In Spanish LOPEZ confronted Plaintiff, telling him he knew that Plaintiff had committed the shooting and that Plaintiff needed to confess or he would get the death penalty. Plaintiff told LOPEZ that he was wanted to speak to an attorney.

58.     LOPEZ ignored Plaintiff's invocation of his right to counsel and continued to accuse him of shooting Sochu, demanding that Plaintiff confess. When Plaintiff maintained his innocence, LOPEZ repeatedly struck Plaintiff about his body. Plaintiff told LOPEZ that he could not admit that he shot Sochu because that was a lie. LOPEZ responded by striking Plaintiff and threatening further violence.

59.     After Plaintiff's requests for an attorney were ignored, Plaintiff attempted to cooperate with LOPEZ to stop LOPEZ from beating him. Plaintiff answered LOPEZ's question about his background and connection to Torres. Plaintiff maintained that he was not gang-affiliated and had arrived in Chicago earlier in the year to find work as a day laborer.

60.     LOPEZ eventually ended the interrogation but returned some time later and told Plaintiff that a lawyer was going to come speak to him and that he would be free to leave after he spoke to the attorney.

61.     Shortly thereafter, LOPEZ returned to the interrogation room with ASA Kent Delgado. Delgado did not speak Spanish and allowed LOPEZ to conduct the questioning of Plaintiff in Spanish. LOPEZ asked Plaintiff questions about his background and then told him to tell him everything from beginning to end. Plaintiff complied reiterating his background, how he came to the United States and his connection to Torres and Simon. Plaintiff did not admit that he had any knowledge or involvement in the shooting of Sochu.

62.     LOPEZ falsely summarized Plaintiff's statements to ASA Delgado, providing a narrative that was partially true and largely false. LOPEZ told ASA Delgado that Plaintiff admitted to committing the shooting and hiding the weapon. This representation was false as Plaintiff had denied all involvement in the shooting. Delgado summarized the false narrative provided to him by LOPEZ in a handwritten statement that was presented to Plaintiff to sign.

63.     Plaintiff had no ability to read the statement as it was written in English. LOPEZ did not accurately translate the English statement to Plaintiff. LOPEZ told Plaintiff that once he signed the statement he would be free to leave. Plaintiff signed the statement without ever reading or understanding it. Plaintiff assumed that the statement contained his truthful

statements, including his statements that he had no role whatsoever in the shooting that resulted in Sochu's death.

64.     After signing the statement, Plaintiff was charged with first degree murder.

65.     Defendant GARCIA falsely testified before the grand jury that his investigation revealed that Plaintiff entered a car with Torres, Bentazos and Simon with the intent to shoot at Two-Six gang members; that Plaintiff was armed with a weapon and that Plaintiff shot the victim. Defendant GARCIA falsely testified that Plaintiff admitted to firing the gun that struck Sochu.

**Plaintiff's Wrongful Convictions**

66.     Plaintiff filed a motion to suppress the statement attributed to him by defendant LOPEZ. LOPEZ falsely testified at a hearing on the motion to suppress, claiming that Plaintiff voluntarily provided an oral statement to him admitting to shooting Sochu and disposing of the gun. LOPEZ also falsely testified that he accurately translated a handwritten summary of the false statement from English to Spanish and that Plaintiff signed the statement knowingly and voluntarily with an understanding of the contents of the inculpatory statement.

67.     LOPEZ falsely testified that he never used any type of physical violence or threats of violence against Plaintiff, either at Plaintiff's home or at Area Four, in an effort to get him to confess to the crime. SCHLEDER also falsely testified that he never used any physical violence against Plaintiff and never observed LOPEZ use physical violence or threats of violence against Plaintiff.

68.     LOPEZ testified falsely again at Plaintiff's criminal trial, claiming that Plaintiff confessed to shooting Sochu and disposing of the weapon. This testimony was false in that Plaintiff never confessed to shooting Sochu or admitted to disposing the murder weapon. LOPEZ

falsely told the jury that he accurately translated a handwritten confession prepared by ASA

Delgado from English to Spanish and that Plaintiff signed the confession with an understanding

of the contents of the statement.

69.     Plaintiff was convicted and sentenced to a term of 90 years' imprisonment.

70.     In 2007, the Illinois Appellate Court reversed Plaintiff's conviction and sentence,

finding that the trial court erred when it allowed the prosecution to introduce inadmissible

hearsay of co-defendants' statements into evidence. *People v. Ochoa,* Unpublished Rule 23

Order, 1-05-1848 (1st Dist. 2007).

71.     Plaintiff was retried for the murder of Sochu again in 2013. LOPEZ and

SCHLEDER *again* gave false testimony in the same manner described above. Plaintiff was again

convicted and sentenced to 90 years' imprisonment.

72.     At no point prior to either trial did Defendants disclose to the Plaintiff or even the

prosecutors the tactics they used to induce false statements from Simon, Bentazos, and Torres

implicating Plaintiff in the shooting. Nor did the Defendants disclose to Plaintiff or the

prosecution that Torres told them Plaintiff was *not* in the car during the shooting and had no role

in the crime. Similarly, neither LOPEZ nor SCHLEDER disclosed that they used physical

violence, threats of violence, and false promises of release to coerce Plaintiff's handwritten

statement.

73.     On February 15, 2017, the Illinois Appellate Court reversed Plaintiff's conviction

and sentence a second time, because the trial court again allowed the prosecution to introduce the

same inadmissible hearsay into evidence. *People v. Ochoa,* 2017 IL App (1st) 140204.

**Plaintiff's Exoneration**

74.     On retrial, the Judge Carol Howard granted Plaintiff's motion to reopen the hearing on his motion to suppress statements after Plaintiff presented extraordinary new evidence of a career-long pattern and practice of misconduct on the part of defendant LOPEZ. This pattern of misconduct was not disclosed to the defense prior to Plaintiff's second trial in 2013.

75.     LOPEZ has a prodigious complaint history consisting of over 50 civilian complaints alleging a range of misconduct over the course of his career, including numerous complaints that he physically coerced statements from suspects and witnesses in the course of investigating cases, that he harassed civilians and threatened to frame civilians for crimes they did not commit, and for stealing property belonging to arrestees or detainees.

76.     Even before becoming a detective, LOPEZ routinely used extreme physical violence in the context of his policing activities. Between 1995 and 2000, LOPEZ was the subject of over 20 civilian complaints for excessive force, harassment, illegal searches, sexual abuse, and stolen property. Notwithstanding, this overwhelming pattern of misconduct in a short period of time, defendant LOPEZ was promoted to detective.

77.     LOPEZ's complaint history reveals that once becoming a detective he continued his unchecked pattern of misconduct that involved routine violence, threats of violence, and dishonesty.

78.     Just by way of example, Peter Lawrence testified that LOPEZ handcuffed him in an interview room at Area Four and questioned him about a murder in November 2001. When Lawrence denied involvement in the crime, LOPEZ repeatedly punched him in the chest and arms, just as he would do to Plaintiff a year later. Lawrence currently has a pending post-conviction petition in the circuit court of cook county related to LOPEZ's conduct.

79.     Elliot Montgomery accused LOPEZ of using physical violence to procure an inculpatory statement from him in a murder case on October 11, 2002 – a mere two months prior to Plaintiff's arrest. Just as LOPEZ did in this case, LOPEZ punched Montgomery in the stomach and chest, threw him to the ground, and grabbed him by the throat while pressing his thumb firmly in Mr. Montgomery's sternal or jugular notch. Mr. Montgomery was never charged with any crimes after he refused to confess.

80.     Lily Ames was interviewed by LOPEZ on March 25, 2003 as a witness in connection with a shooting. Defendant LOPEZ physically assaulted Ames and arrested her without probable cause, claiming she was "obstructing justice." Ames lodged a complaint with the Office of Professional Standards, alleging that LOPEZ choked her and struck her in an effort to get her to make false statements.

81.     In January 2003, LOPEZ forced a wheel-chair bound young man, Kenny Thigpen, to come to Area Four to answer questions about a shooting that he witnessed. Thigpen complied but when he told LOPEZ that the target of LOPEZ's investigation was not the shooter, LOPEZ refused to let Thigpen leave the police station until he signed a statement implicating the innocent person. Thigpen relied on a catheter to urinate and while held in custody for over 12 hours, he repeatedly urinated on himself which was both uncomfortable and humiliating. Eventually Thigpen signed a false statement so that he could leave police custody and get medical attention. Thigpen later recanted his statement, explaining that he only signed the statement so he could leave the police station.

82.     LOPEZ's misconduct continued long after Plaintiff's arrest. Indeed, between 2002 and 2012, LOPEZ accumulated roughly 30 additional civilian complaints, most of which involved his mistreatment of suspects after an arrest.

83. Notwithstanding, LOPEZ's troubling history of mistreatment of suspects, LOPEZ avoided all discipline and was rewarded for his misconduct by being promoted to sergeant. LOPEZ's promotion to sergeant did not curb his bad criminal behavior.

84. In 2018, LOPEZ (and his co-defendants Ronald Watts and Kallett Mohammed) was sued for his role in framing Andrew McNairy for drug crimes he did not commit and which resulted in McNairy's nine-year wrongful conviction. *McNairy v. City of Chicago, et al.,* 18 CV 5127. LOPEZ supervised notoriously corrupt Chicago police officers Watts and Mohammed whose broad scale extortion scheme was discovered when they attempted to shake-down an undercover FBI agent. The United States government later charged Watts and Mohammed for a litany of crimes to which they pled guilty and were sentenced to terms of imprisonment. LOPEZ, Watts and Mohammed conspired to frame McNairy and untold others.

85. On September 23, 2019, after a hearing on Plaintiff's motion to suppress statements, the circuit court granted Plaintiff's motion and suppressed the inculpatory statements attributed to Plaintiff.

86. On October 23, 2019, the State of Illinois dismissed all charges against Plaintiff. Plaintiff was released from custody that same day.

87. At no point between his arrest on December 19, 2002 and his release on October 23, 2019 was Plaintiff released from custody. He remained in custody for the entire duration of that time, nearly 17 years.

**Plaintiff's Damages**

88. Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff spent 17 years of his life imprisoned for crimes that he did not commit. He woke up each day

with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

89.     Over the course of his 17 years of imprisonment, Plaintiff was separated from his daughter who was not even born when he was arrested. Plaintiff lost the chance to raise, care for, and mentor his child who was a grown woman by the time Plaintiff was released from prison.

90.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Due Process:  Compelled Self-Incrimination**

91.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

92.     As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by using violence, threats of violence, trickery, manipulation, and deceit to compel Plaintiff against his will to make statements that were later used to convict him.

93.     In the manner described more fully above, Defendants coerced Plaintiff to make statements that were introduced as inculpatory evidence for crimes they knew he did not commit. Defendants falsified police reports and gave false testimony before a grand jury and two separate juries about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

94. The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

95. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Marilu Sochu. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

96. Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

97. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

98. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

99. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT II**
**42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence**

100. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

101. As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their

employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements.

102.    Defendants LOPEZ and SCHELDER both testified falsely at Plaintiff's trials as described above, claiming that Plaintiff confessed to shooting the weapon that killed Sochu. That testimony was false and fabricated. Both defendants testified falsely when they denied using any physical violence or coercive tactics against Plaintiff during his arrest and interrogation. LOPEZ and SCHLEDER knew that their testimony was false and that Plaintiff had not confessed to committing the crime.

103.    The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

104.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Sochu. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

105.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

106.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

107.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT III**
**42 U.S.C. § 1983 – *Brady* Violations**

108.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

109.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried both the first and second the case.

110.    The Police Officer Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 17 years in prison for a crime he did not commit.

111.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

112.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

113.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT IV**
**42 U.S.C. § 1983 – Prolonged Pre-Trial Detention**

114.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

115.    In a manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

116.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

117.    In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

118.    The Defendant officers subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

119.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

120.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

121.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy**

122.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

123.    All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of confessions, admissions, witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

124.    All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

125.     In this manner, the Police Officer Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

126.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

127.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

128.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

129.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene**

130.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

131.     In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

132.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

133.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

134.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT VII**
**42 U.S.C. § 1983 – *Monell* Policy Claim**

135.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

136.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

137.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants LOPEZ, SCHLEDER, and GARCIA employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false statements of identification; (4) exploiting non-English speaking suspects and tricking/manipulating those suspects into adopting statements they can neither read nor comprehend; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

138.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

139.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically exploited and tricked suspects who could not speak the English language in order to induce them to adopt a statement or confession they did not make, could not read, and did not understand. As a matter of widespread custom and practice, these false confessions attributed to non-English speaking defendants were routinely used to convict defendants at trial.

140.    Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to make statements that were used against him at trial. They named Defendants further fabricated false inculpatory statements never uttered by the Plaintiff and falsely testified that Plaintiff knowingly and voluntary made such inculpatory as the primary piece of evidence against him at his trial.

141.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Defendants used physical

abuse, threats of violence, manipulation and other forms of coercion to secure statements from Plaintiff and his criminal co-defendants.

142. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence that they contrived a false confession that they tricked Plaintiff into adopting and failing to translate the statement in his native language.

143. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

144. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

145. Prior to and during 2002, the year in which Plaintiff was falsely charged with Sochu's murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

146.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

147     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

148.     The Defendant officers, and most notably Defendant LOPEZ has a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated statements, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. Defendant LOPEZ engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

149.     The City of Chicago and its Police Department failed in 2002 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.  The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.  The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.  The risks of engaging in tunnel vision during investigation.

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

150.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

151.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendant LOPEZ effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

29

152.     The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

153.     The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

154.     The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

> a.     conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.
>
> b.     detectives conducting interrogations of Spanish-speaking suspects without the use of a certified interpreter or any interpreter whatsoever.
>
> c.     manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.
>
> d.     filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or

witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, and otherwise covering up the true nature of those interviews and/or interrogations.

e.     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offender Defendant LOPEZ.

f.     perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they

and their fellow officers have fabricated evidence or concealed

exculpatory evidence.

155.     The policies and practices described in this Count and in the factual allegations

section of this Complaint were maintained and implemented by the City of Chicago with

deliberate indifference to Plaintiff's constitutional rights.

156.     As a direct and proximate result of the City's actions, Plaintiff suffered injuries,

including, but not limited to, emotion distress, as if more fully alleged above.

157.     The City of Chicago is therefore liable for the misconduct committed by the

Police Officer Defendants.

**COUNT VIII**
**State Law Claim – Malicious Prosecution**

158.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

159.     All of the individual Defendants caused Plaintiff to be improperly subjected to

judicial proceedings for which there was no probable cause. These judicial proceedings were

instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings

were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

160.     The Defendants accused Plaintiff of murdering Marilu Sochu, knowing that he

was innocent of the crime. All of the individual defendants fabricated evidence, manipulated

witness testimony, and withheld exculpatory evidence. The individual Defendant officers

knowingly made false statements to prosecutors with the intent of exerting influence to institute

and continue judicial proceedings against Plaintiff.

161.     The misconduct described in this Count was undertaken with malice, willfulness

and reckless indifference to Plaintiff's rights.

162.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
### State Law Claim – Civil Conspiracy

163.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

164.    As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

165.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

166.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

167.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

168.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

169.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

170.     The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

171.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

172.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT XI**
**State Law Claim –** *Respondeat Superior*

173.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

174.     When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

175.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XI**
**State Law Claim – Indemnification**

176.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

177.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

178.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Alberto Ochoa prays this Court enter judgment in his favor and against Defendants LOPEZ, SCHLEDER, GARCIA, and the CITY OF CHICAGO awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Respectfully Submitted,

ALBERTO OCHOA

By:     /s/JENNIFER BONJEAN
        *One of His Attorneys*

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
1000 Dean St., Ste. 422
Brooklyn, New York  11238
718-875-1850

Steven A. Greenberg
Greenberg Trial Lawyers
52 W. Jackson Blvd., Ste. 1260
Chicago, Illinois  60604
312-879-9500