1

1    <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                     EASTERN DIVISION

4    ALBERTO OCHOA,                    )
                                       )
5                   Plaintiff,         )  Case No. 20-cv-2977
     -vs-                              )
6                                      )  Chicago, Illinois
     JOSE LOPEZ, et al.,               )  January 27, 2023
7                                      )  11:33 a.m.
                    Defendants.        )
8
                     TRANSCRIPT OF PROCEEDINGS
9      BEFORE THE HONORABLE YOUNG B. KIM, MAGISTRATE JUDGE

10   APPEARANCES:

11   For the Plaintiff:    MS. JENNIFER A. BONJEAN
                           Bonjean Law Group, PLLC
12                         750 Lexington Avenue
                           9th Floor
13                         New York, NY 10022
                           (718) 875-1850
14                         E-mail:  Jennifer@bonjeanlaw.com

15   For the Individual
     Defendants:           MR. GRAHAM P. MILLER
16                         Borkan & Scahill, Ltd.
                           20 South Clark Street
17                         Suite 1700
                           Chicago, IL  60603
18                         (312) 580-1030
                           E-mail: Gmiller@borkanscahill.com
19
          **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
20          NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
               PORTIONS UNINTELLIGIBLE AND INAUDIBLE
21
     Transcriber:
22
                KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
23                    Official Court Reporter
                   United States District Court
24          219 South Dearborn Street, Suite 1426
                    Chicago, Illinois  60604
25              Telephone:  (312) 435-5569
             Kathleen_Fennell@ilnd.uscourts.gov

1    APPEARANCES:    (Continued)

2    For Defendant City
     Of Chicago:              MR. ZAC   HALDEN
3                             Kulwin, Masciopinto & Kulwin, LLP
                              161 N. Clark Street
4                             Suite 2500
                              Chicago, IL   60601
5                             (312) 641-0300
                              E-mail: Zhalden@kmklawllp.com
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings heard in open court:)

2           THE CLERK:  Calling case 20 CV 2977, Ochoa versus

3  Lopez, et al.

4           THE COURT:  Please approach the podium.  Good

5  morning.

6           MS. BONJEAN:  Good morning, your Honor.  Jennifer

7  Bonjean, B-O-N-J-E-A-N, on behalf of the plaintiff, Mr. Ochoa.

8           MR. MILLER:  And Graham Miller on behalf of the

9  defendant detectives.

10           MR. HALDEN:  Good morning, your Honor.  Zac Halden

11  for the City of Chicago.

12           THE COURT:  Oh, you just filed your appearance,

13  right?

14           MR. HALDEN:  Yes, your Honor.

15           THE COURT:  Okay.  Thank you.

16           MR. HALDEN:  We did not file a pleading.

17           THE COURT:  Got it.

18      So let me ask the question of Mr. Miller, and then I

19  will give Ms. Bonjean an opportunity to respond to detectives'

20  arguments.

21           I'm curious about this statement in the response, and

22  I'm quoting from page 11 of the response:  "Defendants have

23  learned from Cook County gang intelligence personnel that

24  these calls contain evidence of plaintiff's gang membership."

25           MR. MILLER:  Correct.

1    THE COURT:  How do they know?

2    MR. MILLER:  I believe that they have listened to

3    some of the calls.  They monitor the calls between, you know,

4    known gang members in the prison as part of their duties.

5    THE COURT:  So did the gang intelligence personnel

6    contact the detectives?  How did this come about?

7    MR. MILLER:  I contacted gang intelligence personnel

8    investigate -- so back in the criminal case, there was -- the

9    prosecution had attempted to call one of these gang

10   intelligence personnel to testify.

11   So I spoke with him and through him spoke with some

12   of the other guys there.  I was inquiring generally about

13   Mr. Ochoa's gang involvement in the prison, what they knew

14   about it, whether there were any leftover gang intelligence

15   files because we don't believe we got everything from Cook

16   County in the subpoenas, and they indicated to me that, you

17   know, they believe that calls with another Latin Kings gang

18   member, that there's been a number of them and that these

19   would just establish evidence of Mr. Ochoa's gang involvement

20   with the Latin Kings.

21   THE COURT:  And what's your basis for making the

22   assertion that Mr. Raul Molina is a Latin King member?

23   MR. MILLER:  Part of these gang intelligence

24   personnel, part of their job is knowing, you know, who is

25   affiliated with gangs in the prisons, you know, the different

1  gangs who are rivals.  I mean, for safety concerns, among

2  other things, they're taxed with knowing that information.  So

3  that's information that they get.

4         THE COURT:  And when you contacted the gang

5  intelligence personnel, I take it you didn't need a formal

6  subpoena to ask questions of the personnel?

7         MR. MILLER:  I don't believe so.  I think we can

8  conduct our own investigation and talk to, you know, whoever

9  may have information.

10        THE COURT:  Because I got the sense from the last

11  time we were in court there was somewhat of a firewall between

12  departments and whatnot, and formalities have to be honored or

13  observed.

14        MR. MILLER:  I mean, obviously, you know, we've

15  subpoenaed these records as well, but I don't think there's

16  any rule against us conducting our own investigation.  They

17  don't have to talk to us, of course, I mean, but I've called

18  and said, hey, what do you know about this guy, and they were

19  willing to say, yeah, I know him.  You know, we have

20  information about him.

21        THE COURT:  Okay.  Can you explain to me your

22  footnote 1?  I'm not following.

23        So initially the subpoena went out asking for calls

24  between Mr. Molina and the plaintiff taking place between

25  December 19, 2019 to the present, right?

1          MR. MILLER:  Correct.  That was just a mistake on my

2     part.  December 19th, which actually happens to be my

3     birthday, but I think that I wasn't thinking about that; I

4     think I was thinking about that was the day of -- it was

5     either the murder or the day of his confession.  Whatever it

6     was, that was a mistake.  It should have been October 23rd,

7     2019, which is the date he was released.

8          THE COURT:  So you need additional calls from

9     October 23, 2019 to December 19, 20 --

10          MR. MILLER:  Correct.

11          THE COURT:  -- 19.

12          MR. MILLER:  Correct.  For completeness, we would

13     like --

14          THE COURT:  So two months.

15          MR. MILLER:  Approximately two months, correct.

16          THE COURT:  But you already have in your possession,

17     what, 20 --

18          MR. MILLER:  So we have.

19          THE COURT:  -- almost two-and-a-half years worth of

20     calls?

21          MR. MILLER:  Correct.

22          THE COURT:  How many calls did you actually receive?

23          MR. MILLER:  I think it was close to 500 calls.  I

24     don't know the exact number.  We've only listened to a

25     small --

1    THE COURT:  And these calls are, at least based on

2    your subpoena, only calls between Molina and plaintiff?

3    MR. MILLER:  Correct.  That was what was in the

4    subpoena.  Plaintiff's counsel has pointed out that there

5    apparently are other calls between Molina and other

6    individuals, is that -- or between plaintiff and -- I believe

7    other individuals apparently or other numbers.

8    THE COURT:  Let me ask you, prior to the filing of

9    this motion on January 17, 2023, have you listened to any of

10   the calls, and have you confirmed whether plaintiff has said

11   anything to indicate that he was, in fact, a gang member?

12   MR. MILLER:  So we listened to a very small

13   percentage of the calls.  As we set forth in the motion, by

14   the time we realized we had the calls, it was December 13th or

15   12th, and we started downloading them, and then we sent them

16   to plaintiff's counsel.  Plaintiff's counsel objected when she

17   received them, so we had only listened to whatever we had, you

18   know, a chance to go through that night.

19   I had maybe listened to five calls.  Part of the

20   problems they switch back and forth from English to Spanish.

21   The way it appears to me is that when they kind of start

22   talking about business, they kind of switch into Spanish.

23   And, you know, I don't know.  I would have to listen to them

24   more carefully.  I can't tell you that there's -- you know,

25   affirmatively that I've had evidence so far.

1      THE COURT:  And Mr. Molina, how old is he, do you
2  know?
3      MR. MILLER:  I'm not sure.
4      Oh, you know, it might be on the subpoena.
5      We may have used it as an identifier for Mr. Molina.
6      Sorry, your Honor, one of these exhibits is the
7  subpoena.
8      THE COURT:  Should be the subpoena, right?
9      MR. MILLER:  Yeah.
10      (Inaudible.)
11      MR. MILLER:  We don't have it on the subpoena.  We
12  just have the CB number of the -- oh, here it is, DOB,
13  2/15/94.
14      THE COURT:  How old is Mr. Ochoa?
15      MS. BONJEAN:  Mr. Ochoa is -- he is -- well, let me
16  do the math real quick because I don't have his birthday
17  memorized, but the incident happened in 2002.  He was in his
18  early 20s in 2002, so he's significantly older.
19      THE COURT:  Okay.  Thank you.
20      All right.  Let me give you an opportunity,
21  Ms. Bonjean, to respond to the detectives' opposition to the
22  motion.
23      MS. BONJEAN:  Yes, Judge.
24      So, first of all, I want to clarify.  What was
25  produced was not just Mr. Molina's calls.  What was asked for

1   were calls from Mr. Molina to Mr. Ochoa, and what was sent was

2   every call that's ever been made to Mr. Ochoa from Cook County

3   Jail, which, as you can imagine, might be quite a few because

4   that's where he had spent the last 17 years of his life.

5           So it wasn't just Mr. Molina's calls.  It was other

6   people, other inmates, you know, friendships that he had made

7   with individuals because he had been in Cook County for long.

8   So about 25 percent of those calls, at least according to the

9   call log, I believe, are not Mr. Molina at all.  They're just

10  other people.

11          THE COURT:  Meaning other detainees from the county

12  jail calling out to Mr. Ochoa?

13          MS. BONJEAN:  Yes, yes.

14          THE COURT:  Okay.

15          MS. BONJEAN:  So what Cook County Jail did, I think,

16  is just every call that was ever made to Mr. Ochoa is my

17  understanding.

18          Again, one of my primary issues is that it was my

19  belief that the defendants knew our objection to any sort of

20  blanket approach to this, and we had what I thought, at least

21  the spirit of an agreement in place that you will let me know

22  if you have some calls that you want to get at and you think

23  there's a reason for it.

24          They did not.  In fact, Mr. Molina's name appears

25  absolutely nowhere.  They have some private conversation with

1    gang intelligence officers.  They claim through -- again,

2    there are no documents.  There's been no production of any

3    gang intelligence reports, absolutely nothing that creates a

4    nexus between my client and the Latin Kings.

5         My client has been very open and testified, yeah, I

6    was friends with Latin Kings.  I hung out with Latin Kings.  I

7    was in prison for 17 years.  But, no, at the time of this

8    murder, I was not.  I was in this country six, nine months at

9    the most.  I lived in a neighborhood that was -- had many gang

10   members in it.  When I went to prison, I certainly had friends

11   who were gang members.

12        I -- so this idea that he is a Latin King, all we

13   have is some third-hand evidence from a gang intelligence

14   person who never testified at any -- at Mr. Ochoa's trial, and

15   we've had no reports or any discovery on that.

16        So, you know, I'm just taking the defendants' word

17   that they believe that this will include some evidence that he

18   is in a gang, which I am not sure is entirely relevant even if

19   it was true, since it's now 2019.  Whether Mr. Ochoa is

20   currently in a gang seems to me of far less relevance than

21   whether he was in a gang in 2002, which is really the crux of

22   this case.

23        It's not as if he is denying all associations in the

24   sense of I had no friends, I never talked to any gang members.

25   He's never said that.  He's always admitted that since his

1   time in jail.

2          I think that to -- I don't know whether Mr. Molina is

3   in a gang, but I'm going to assume that the gang intelligence

4   officers for the moment seem to think that he is.

5          Going through, you know, hundreds of calls between my

6   client and someone they believe is a gang member to ultimately

7   find out what they believe they will find out, which is that

8   he has some association with the gang, you know, I think our

9   position is that that is an intrusion that is not justified

10  and that they need to show more.

11         For example, if they showed us the gang intelligence

12  reports.  Show me the gang intelligence reports that show some

13  connection, where the gang intelligence officers say, well, we

14  know Mr. Ochoa is in a gang because of this, this and this.

15         The case law has pretty much, I think, taken the

16  position that if we're going to allow you to sift through

17  phone calls, we want to see something in the evidence,

18  something in the discovery that already makes this nexus for

19  us, and then -- because until then, this is just, again, the

20  defense team apparently having off-the-record conversations

21  with some gang intelligence officers that is not backed up by

22  anything.

23         They haven't even put Mr. Molina on their Rule 26(a)

24  disclosures because, as Mr. Miller admitted, well, we don't

25  know if there's anything there.  And even though he doesn't

1  speak Spanish, he's just speculating that maybe they're

2  talking about business.  I mean, you know, again, this is just

3  wild speculation at this point.

4         And so I think -- I think at a minimum, we should see

5  some evidence that the gang intelligence officers of the Cook

6  County Jail -- by the way, who were never around in 2002, to

7  be clear.  These gang intelligence officers came on to in the

8  mid-2000s.  I think one of them only started working as a gang

9  intelligence officer in 2017.  So we're not talking about gang

10 intelligence officers who have any knowledge about my client

11 back during the relevant time period from our perspective.

12        So I think that's kind of our position at this point,

13 that they need to show a little more before they're allowed to

14 just -- before they should be permitted the opportunity to

15 sift through all of these phone calls.

16        And I do think it's problematic that the

17 defendants -- it's unfortunate we missed it, but the

18 defendants continue to issue subpoenas to third parties, such

19 as Cook County Jail, without making any effort whatsoever even

20 when they know someone's represented to make sure that their

21 interests are being protected or they have the right to voice

22 an objection, Mr. Molina being one of them, Mr. Bentazos and

23 Mr. Simon twice now, and then even another inmate from the

24 Illinois Department of Corrections.

25        It's just a recurring theme that invariably, it's,

1   you know, maybe not going to intrude on my client's rights as

2   much, but I shouldn't be the person having to give notice to

3   all these -- the public defenders that their clients may be

4   negatively impacted and that they do have some privacy

5   interests.

6           So, you know, that's sort of a separate note, but it

7   is a recurring issue that is concerning.  But I think at

8   bottom, they need to give us something a little more, the gang

9   intelligence reports at least, that, you know, back up what

10  these gang intelligence officers are allegedly saying that

11  we've never heard about, at least plaintiffs haven't heard

12  about.

13          THE COURT:  Anything else?

14          MS. BONJEAN:  No, your Honor.

15          THE COURT:  Mr. Miller?

16          MR. MILLER:  No, your Honor.  I would just point out

17  that Mr. Ochoa has unequivocally denied any involvement ever

18  in being part of a gang.  The closest he's come is saying I

19  may have used their handshake and called other gang members

20  brother, but, you know, this isn't the case where he said,

21  well, I wasn't in a gang back then, but maybe I joined in

22  prison, you know, for protection or something.  He said I've

23  never been affiliated with the Latin Kings.  So we believe

24  that these calls will establish that's not true.

25          THE COURT:  Okay.  Thank you.

1      First of all, I do agree with the defendant

2  detectives that the motion itself is untimely.  We shouldn't

3  be talking about quashing or a protective order regarding a

4  subpoena after the subpoena has been served and after the

5  respondent has actually produced documents in response to that

6  subpoena.

7      But obviously relevance and 26 -- Rule 26 parameters

8  are still important, and when I saw the motion, my first

9  reaction was the same thing, I think same reaction you had,

10  Ms. Bonjean, what relevance do these calls have and do you

11  have any factual basis to even look at these calls?

12      And that's why I started out the hearing with the

13  question as to how do these intelligence officers know; and

14  according to Mr. Miller's representation, they listened to

15  some of these audio recordings, which I guess it's their job

16  to listen to these recordings.

17      And that is sufficient for me that there is some

18  reasonable basis for looking into this particular universe of

19  information.  And in terms of other calls being produced,

20  that's easy to be remedied, simply that defendants are to

21  limit their view, I should say listening of the calls to those

22  calls specifically initiated by Mr. Raul Molina.

23      But I do understand even that might be problematic

24  because Mr. Molina, I don't know how this phone thing works,

25  but Mr. Molina may have given his code or whatever to others

1    to make phone calls.  And if that's the case, then, you know,

2    I'm not going to stop the defendants from listening to those

3    calls because it's going to be harder at that point.

4           So if -- so let me ask the question:  How are these

5    calls tracked?  I mean, Cook County, my guess is that they

6    simply put in the cell number and just collected everything

7    pertaining to that particular cell number.

8           But what do you mean when you say Mr. Molina may have

9    given his number or information to others to make phone calls?

10          MR. MILLER:  Right, you know, and I don't know that's

11   what happened in this case.  I mean, what often happens is,

12   you know, inmates will use other inmates' accounts to call

13   out, or on the other end, they will talk to another person

14   through somebody else's phone number.

15          You know, this is a little tricky because I can't

16   tell whether Molina is actually on these calls without

17   listening to them.

18          THE COURT:  But when you say account number, what do

19   you mean?  I mean, I thought the receiving end has to pay for

20   the call.

21          MR. MILLER:  Yeah, you can -- well, I don't know

22   exactly how that works.  I just know that we have -- you know,

23   we have situations where one -- it's tracked to one inmate,

24   but it's, in fact, the other inmate making the call.

25          THE COURT:  Okay.  So let me go ahead and continue.

1        MR. MILLER:  Yeah.

2        THE COURT:  You know, to the extent that the calls

3  can be identified to be Mr. Molina initiating the call, I'm

4  going to allow the detective defendants to listen to those

5  calls.

6        We talk about, and, Ms. Bonjean, you raise a good

7  point, you know, what difference does it make if those calls

8  tend to raise an inference that Mr. Ochoa is a member now?  I

9  get that.  But that's a battle to be fought in a motion in

10  limine before Judge Valderrama as to whether there is any

11  probative value to those calls if there are any calls.  We

12  don't know that yet.

13        So that is something that needs to be addressed

14  before Judge Valderrama if any calls are to be identified as

15  evidence.  The fact that Mr. Molina has not been identified,

16  you know, that's really not germane to this particular

17  analysis because defendant detectives are working off of

18  information received from others, not from Mr. Molina.

19        In terms of the privacy interests, in terms of

20  notifying attorneys, I get your concerns.  It would be nice if

21  everyone was notified, but I'm not sure that there is any

22  obligation on the part of the County because it's their

23  record, right?  And the subpoena is served on the County.

24        And so technically speaking, I'm not sure that the

25  County has to notify anyone.  I mean, it is their business

1    record, and all the callers know that these calls are not
2    private.

3            So for those reasons, the motion for a protective
4    order is denied.  I will indicate in the order today that only
5    calls initiated by Mr. Molina to plaintiff can be listened to.

6            Again, the other thing that I would mention is that
7    the burden really is not on the plaintiff in terms of
8    listening to the calls, so the plaintiff doesn't have to do
9    anything at this point.

10           Defendants will have to do the work in terms of going
11   through the calls and listening to the calls and identifying
12   any relevant calls.

13           Now that you're here, let me ask you, do we have
14   another status hearing set in this case?

15           MR. MILLER:  That's a good question, Judge.

16           We did file a joint status report back in January,
17   but I don't know whether --

18           THE COURT:  Yes, we have one set for February 3rd, it
19   looks like.

20           MS. BONJEAN:  Yes.

21           MR. MILLER:  Oh, right, it's next week.  Yes.

22           THE COURT:  So let me ask these questions.

23           I have on my notes I have -- in my notes I have these
24   names, Dr. Enoch Anaglate, E-N-O-C-H, A-N-A-G-L-A-T-E.  She
25   was supposed to have been deposed on December 13th.  Kenny

1    Thigpen, a 404(b) witness, to be deposed on December 21, 2022.

2             MS. BONJEAN:  Yes, they were deposed, both of them.

3             THE COURT:  Scheduled -- Arturo Simon was supposed to

4    have been deposed on January 11th, 2023.  Yes?

5             MS. BONJEAN:  Yes.

6             THE COURT:  Daniel Ochoa to be deposed on January 13?

7             MS. BONJEAN:  Yes, Judge.  He -- he was deposed.

8    Actually, you raise -- this prompts my memory.

9             The defendants reserved one hour.  We had agreed -- I

10   had agreed that he -- for a 12-hour deposition because of the

11   interpretation.

12            The defendants reserved an hour to question him about

13   the phone calls because the phone calls were only produced one

14   day before his deposition, so obviously that was a little

15   problematic, not knowing what was in the phone calls.

16            We agreed -- I would ask obviously that, if we're

17   talking about hundreds of phone calls, that the phone calls

18   that they believe are, particularly if they're going to be

19   translating some of these phone calls, that the defendants

20   identify for us what phone calls they think are relevant to

21   this litigation.

22            My client's not particularly concerned about any of

23   the phone calls, but it's -- it just seems to me that they

24   should at least give us a heads up if they're going to spend

25   hours going through -- I mean, it's literally going to be

1   hours of review, so --

2          THE COURT:  Do I have this name wrong then?  I have
3   Daniel Ochoa.

4          MS. BONJEAN:  It's Alberto Daniel Ochoa Piccardo.

5          THE COURT:  Ah.  So it was plaintiff who was deposed
6   on January 13th.

7          MS. BONJEAN:  Correct.

8          THE COURT:  And one hour was reserved.

9          MS. BONJEAN:  Yes.  We did 11 hours, well, in two
10  days.

11         THE COURT:  And do you have the date for the second
12  deposition?

13         MS. BONJEAN:  It would be the third, but, no, we
14  don't have a date yet because we were waiting on the Court's
15  ruling as it relates to this matter.  That's the only subject
16  matter that was reserved on.

17         THE COURT:  In terms of identifying calls to be
18  reviewed, I mean, it's really up to the defendants.
19  Oftentimes defendants -- oftentimes exhibits to be produced or
20  discussed at a deposition are considered work product because
21  the identification by the attorney is considered work product.

22         However, if only one hour is reserved, it's up to the
23  defendants how they wish to prepare for that deposition.
24  Obviously, things will go more smoothly and more efficiently
25  if Mr. Ochoa was able to listen to the calls, if any calls are

1    to be questioned about, at the third session.

2           Bryan Holy is still scheduled to be deposed on

3    February 3rd?

4           MR. MILLER:  Yes.

5           MS. BONJEAN:  I believe that's correct, your Honor.

6           THE COURT:  And I've got Adrienne Davis to be deposed

7    on February 28th.

8           MR. MILLER:  Judge Davis, there's been a number of

9    reschedulings of Judge Davis, and I don't believe she's set to

10   proceed on that date.  It's been moved a number of times.

11          You had the 18th, your Honor?

12          THE COURT:  I'm sorry?

13          MR. MILLER:  You had the 18th?

14          THE COURT:  I have 28th down.  This must be from a

15   joint status report.

16          MR. MILLER:  Yeah, and I -- oh, I think we moved it

17   to the -- we couldn't do the 28th, and then we moved it to the

18   18th, and now we can't do the 18th.  So there is no -- Judge

19   Davis has not been currently scheduled.

20          I am in contact with her attorney.  We're just

21   looking for dates that are going to work with everybody.

22          MS. BONJEAN:  I have her on the 28th, so I don't

23   know.

24          MR. MILLER:  Oh, you do as going?  I thought --

25          MS. BONJEAN:  I mean --

1    MR. MILLER:  Well, we can --

2    THE COURT:  Okay.  Here's what I'm going to do.  I'm

3  going to go ahead and reschedule the February 3rd since you're

4  already -- oh, well, let me finish giving you the opportunity.

5  Any issues you want to raise since you're here?

6    MS. BONJEAN:  No, Judge.  We will obviously want to

7  now be deposing these gang intelligence officers who were,

8  again, just -- their names were just identified on, I think,

9  January 12th, so they were not originally on the plaintiff's

10  list to depose, but now they will be.

11    But clearly we don't want to depose them until we

12  have all the documents that allegedly they have prepared as

13  part of their gang intelligence work in Cook County Jail,

14  which have been subpoenaed but have not been returned.

15    THE COURT:  Let me say this much about the

16  intelligence officers.  Unless they are going to be identified

17  as witnesses, I'm not going to allow their depositions because

18  whatever they say won't change what's on the call, right?

19    The calls are the calls.  If the calls say nothing

20  about gang membership, then that's it, we end there.  If the

21  calls can be interpreted to say that Mr. Ochoa may be in a

22  gang or affiliated with a gang, intelligence officers'

23  testimony isn't going to change what's on those calls.

24    MS. BONJEAN:  Well, they have identified them as

25  witnesses, as expert witnesses, too, so --

1      THE COURT:  If they are, in fact, identified --

2      MS. BONJEAN:  Yeah.

3      THE COURT:  -- totally up to you.

4      Anything else?  Let's see.  What else you were going

5 to say?

6      MS. BONJEAN:  We have one other detective that we're

7 working on, I think the City is working on making him

8 available.

9      THE COURT:  Any issues from the defendants' side?

10      MR. MILLER:  No.  We have a -- we have three ASAs

11 scheduled, and then we have -- we are going to issue some

12 written discovery, I think, to try to obviate the depositions

13 of the public defenders.

14      THE COURT:  When you say written discovery, what do

15 you mean?

16      MR. MILLER:  So requests to admit to the plaintiff is

17 what I think we're going to do to see whether we can obviate

18 those depositions.

19      And then we have a number of 404(b) witnesses where

20 we have dates from plaintiff's counsel.  So we're just trying

21 to fit those people in when we can get them served.

22 There's -- two of them are incarcerated, one of them is under

23 plaintiff's control.  We have two others served, so I expect

24 at least to be able to get those done.

25      THE COURT:  Can you check your schedule for -- I'm

1    sorry, the City has any issues you want to raise?

2              MR. HALDEN:  No, your Honor.

3              THE COURT:  All right.  Can you check your schedule

4    for March 3rd at 10:00 a.m.  This will be by phone.

5              MR. MILLER:  That will work.

6              MS. BONJEAN:  Yes, your Honor.  That works for us.

7              THE COURT:  Okay.  Well, again, the purpose of this

8    status hearing is to touch base and see if there are any

9    issues we need to work on.

10             Thank you.

11             MS. BONJEAN:  Thank you.

12             MR. MILLER:  Thank you, your Honor.

13             MR. HALDEN:  Thank you.

14        (Which were all the proceedings heard.)

15                         CERTIFICATE

16        I certify that the foregoing is a correct transcript from

17   the digital recording of proceedings in the above-entitled

18   matter to the best of my ability, given the limitations of

19   using a digital-recording system.

20   */s/Kathleen M. Fennell*              *January 30, 2023*

21   _____         _____
     Kathleen M. Fennell                    Date
22   Official Court Reporter

23

24

25